Terry Allen Parks v. Terrebonne Parish Good morning, Your Honors. I'm Jareth Smith III. I'm privileged to represent Mr. Terry Parks this morning. A little bit by way of introduction, as of October 15, 2015, Mr. Parks had worked for the Terrebonne Parish Consolidated Government for 33 years. He was a long-term employee. His performance evaluations were excellent. His work performance was excellent. He had only one verbal reprimand in 33 years, but on October, he was an instrumentation technician. October 15, 2015, his life changed very much. As Your Honors are aware, this is the case alleging a constructive discharge from his employment with the Terrebonne Parish Consolidated Government. The first issue I'd like to take up is are there genuine issues of material fact as to whether there was a constructive discharge. I, of course, remind the Court that all the evidence in the record should be viewed in the light most favorable to the non-movement. This idea of constructive discharge, either or ultimatum between the rock and the hard place, I won't try to say the more difficult phrase to say, but Your Honors are aware of it. It is inherently coercive, and that goes back to the cases of Bueno and Fenderson, which I cited in my briefs, and I think both parties have. That kind of either or ultimatum is inherently coercive, we respectfully submit. Under the facts of this case, it clearly shows fact issues as to the constructive discharge. From Mr. Parks' deposition, which is in the summary judgment record, he testified that his superiors threatened that he would not have health insurance in the future for he and his wife if he did not agree to the ultimatum to be fired or take an early retirement. They also threatened him that his state retirement benefits would be, he would lose that, which he had worked for for 33 years. Of course, that was a false threat. He had earned that. They couldn't take that away from him, but he was scared. He feared that he would lose those state retirement benefits, and that was told him to by his superiors. Mr. Al Leveron, who was the parish manager, said, Mr. Parks, don't think about this too much. Don't overthink it. And he was pressured into taking early retirement that very day. They were going to give him a little bit longer, but Mr. Leveron called him in the afternoon of 10-15-2015 and said, if you don't take an early retirement today, you're going to be fired first thing in the morning. And the summary judgment record shows that he was under a lot of pressure that day. There's one piece of medical evidence in the record at 1876 that says that Mr. Parks was being treated for, was being treated by Welbutrin and Xanax, which was, of course, anxiety and depression medications at the time. Mr. Parks said he wanted to talk to the HR director, Mr. Dana Ortego, about how the decision would affect him, but Mr. Ortego would not talk to him except for telling him he could take a retest. He said that Mr. Ortego was hush mouth. Parks informed his employers that he would not want to take a retest because it was from the same sample that had originally been tested, which Mr. Parks contended was flawed. That's the totality of the evidence, one of which we think that's a jury issue, as to whether it was constructive discharge. The trial court did not make a finding in that regard, simply assumed that there was a fact issue as to constructive discharge and went on to decide the remaining elements of the case. My second point is if there was constructive discharge, was there a violation of procedural due process because of inadequate pre-termination notice and hearing? Now, I'll run through it real quickly, but to remind the court of the record, under the Laudamil case, Cleveland Board of Education v. Laudamil, there are four elements of a due process violation. Number one, there has to be notice of the charge. Number two, there has to be an explanation of the employer's evidence. Number three, there has to be an opportunity to present the employee's side of the story. And number four, the pre-termination hearing has to address the appropriateness or necessity of discharge, even where the facts are clear. And we respectfully submit that there is no compliance with any of the four elements in this case. Mr. Leveron, the parish manager, testified, and I quote briefly at page 19, other than suggesting that you would send to Mr. Parks information about the appeal procedure, did you have any further discussion with him at any time concerning the right to hearing or right to state his side of the story or anything of that nature? And he said no. And then Mr. Dana Ortego, the HR director, did testify that he had offered him a retest on the same old sample that was at issue, and Mr. Ortego testified that that offering of a retest was a pre-termination hearing. That's how he got his pre-termination hearing. That's not in compliance with Cleveland Board of Education v. Laudermill. That's a clear violation. There was no meaningful opportunity for Mr. Parks to have any of those protections at Laudermill. He did not have a chance to affect the decision before it was made at the outset. One of the things about the appropriateness or necessity of discharge, he could have come in and said if there had been a pre-termination hearing, look, you know, even if I smoked a little marijuana, I've been a plaintiff for 33 years. I've never done anything wrong. Excellent reviews. You know, please consider whether this is really a firing offense. But no, they just ditched the guy after 33 years. Now, one of the things I also want to address is, what is the relevance of the evidence of the violation of the federal testing procedures? We do not contend that the evidence of these violations in and of itself prove a deprivation of due process. But how it comes in and how it's very important is under Matthews v. Eldridge, as we all know is the seminal case in this area. And one of the prongs of Matthews v. Eldridge is, what is the probable value of alternative or substitute procedural safeguards? Now, in this case, that prong is extremely important because of the evidence of the violation of the federal testing regulations. The Terrebonne Parishes Ordinance and Policies itself state and require that the testing procedure must comply with the Federal Code of Regulations at 49 CFR Part 40. And they didn't do that by their own evidence. And this was that Mr. Parks did not have an opportunity to discuss or address the violation of these testing procedures. And if he had adequate due process, he would have been able to do so. Now, I'm going to sort of summarize the violation of the testing procedures in three ways. And I note at the outset that according to the federal regulations, the purpose is to ensure the reliability and accuracy of the test results before they're used to cause significant consequence to a person. But there are three violations here that are really important we respectfully submit. And the first one is there was no valid inception of the chain of custody. The federal regulations unequivocally require the collector of the urine to certify that it was properly sealed. And that cannot be delegated to anyone. The collector did not do that in this case. He also must record on the custody and control form the fact that the specimen was properly sealed. That initiates the chain of custody. In this case, Mr. Park may have testified that there was no proper initiation of the chain of custody or that the chain of custody was broken. And that's a clear violation of the federal regulations. The second clear violation is there was no split sample. I've cited this in the briefs, but the federal regulations require a split sample, at least two samples, and there was no split sample here. In preparation for the argument, I found 49 CFR Section 40.187E1, and they say that if there's no split sample, the test must be canceled. Now, there was no split sample here. The test was invalid in that respect. Moreover, the participation of the MRO was invalid. The regulations require that the MRO play a valid gatekeeping role and to talk with the testing subject, explain to him the tentative finding of a positive test, find out all the medical evidence, try to discuss that with him and have that one-on-one conversation with him. He didn't do that in this case. A nurse did that. And Dr. Hynden, I asked Dr. Hynden, I said, Dr. Hynden, did you know this was supposed to be a federal test? He said, no, I didn't know that. I said, Dr. Hynden, if you had known that it was a federal test, would you have reported this as positive, this test as positive? And he said, no, I would not have. And that's exactly in conformity with the testing regulations that the positive test is not to be reported in the absence of a following of the regulations. Now, this is simply invalid in terms of the regulations. And it's really prejudicial, too, because the only evidence they had of Mr. Parks doing anything wrong was this invalid positive test. There was no misconduct. There was no corroboration of any drug impairment or anything like that. The termination was based solely on the results of the invalid drug test. In the Richard v. Lafayette Fire and Police Case Society, Louisiana Supreme Court, they talk about that the MRO participation is supposed to be a part of the due process, adequate procedures that someone must be afforded. The second, the third topic I'd like to discuss is the availability of a grievance procedure curing or cleanse any pre-termination violation of due process. As your Honor is aware, in Gilbert v. Homer, the Supreme Court held that due process requires a comprehensive post-termination hearing. In this case, there was no comprehensive pre-termination hearing. In many cases where there's a weak or no pre-termination hearing, a post-termination hearing can cleanse that or cure that. But there's nothing here that would allow that, that cleansing or curing, and it's simply a total failure of due process. The last thing I'd like to address is the assertion of the trial court, and I'm going to rephrase this assertion a little bit, but it's an essential assertion that the plaintiff in a case like this must prove that the defendant had the specific intent to deprive him of pre-termination due process. And with respect to the district court, that does come from some language of this court. This court noted in the LaBeouf v. Manning case, which was cited in the briefs, that there's a split in this circuit's authority as to whether that's required. And that's been briefed. We suggest that it should not be required for several reasons. Number one, the rule of orderliness. Under the rule of orderliness, the Beno case is the beginning case. There's nothing in there about that. That must be followed. Secondly, just generally, Penn State police v. suitors, a constructive discharge case is decided objectively. It's not based on subjective intent. And lastly, under the Pratt v. Taylor case, which I didn't cite in the briefs, but your honors are very familiar with it, it's clear that a 1983 violation does not require specific intent. It requires general intent, and the general intent is furnished by the constructive discharge itself. And so that was legal error for the trial court to self-include. I'm about to run out of time. I appreciate the court's consideration of the case. All right. Thank you, sir. May I have your rebuttal? Good morning. My name is Julius P. Abay, Jr. I, along with Brian Marceau, represent the Terrebonne Parish Consolidated Government. May it please the court, this is a 1983 civil rights action that was filed by Terry Parks against the Terrebonne Parish Consolidated Government. And if you look at the amended complaint, you've got to see what they asked for. Mr. Parks had retired from the parish a few days from prescription, or I think it might have even been the day before prescription we get this lawsuit in. In his complaint, in his amended complaint, he alleged that he was given an ultimatum and he sued, besides the Terrebonne Parish Consolidated Government, he sued the contracted companies, private companies, that administer the drug policy. At no time have they alleged that the drug policy itself is a Monell policy violation. They cited and attached a part of the policy to their brief excerpts. That's why, as part of my attachments, not only did I give you his handwritten retirement at 4 o'clock on October 15, 2015, but I attached another part, the beginning part of the policy, which states that the policy of the Terrebonne Parish Consolidated Government adopts both the DOTD policy, certain portions of it, and the state of Louisiana drug policy. And it administers it accordingly, depending on whether you consider it to be a DOT employee or a non-DOT employee. There's no question Mr. Parks is a non-DOTD safety-sensitive employee. We contracted out with MMSI, who is the collector. We contracted out with the Allure Toxicology, which is the lab, and with Dr. Prine Henning, which is the MRO. He sued them all. Two of those parties got out. One of them got out on summary judgment, which is MMSI. He alleged Fourth Amendment rights. He also brought up all these little ledge flaws, which there were none. And the trial court granted some judgment in the final judgment. Against Allure, a judgment was entered on the pleadings. On Dr. Henning, they sued Dr. Henning. They didn't even pursue it. It was ultimately dismissed and judgment entered because they had not pursued Dr. Henning. We're not responsible for those private actors and what they do, but everything they did, we went the extra mile to make sure everything was done right. There is, in this case, no genuine issue of material fact to support a deliberate indifference in 1983 action against the Terrible Empires Consolidated Government. You've got to think in terms of what transpired here. We have a random program for safety-sensitive employees. Mr. Parks tested positive. Mr. Parks had gone through seven prior drug tests and had filed previous grievances with the parish before. He was ultimately familiar with everything. He is correct. His client was a long-time employee. He had access to the policies. He even said in his testimony he knew the policies. With regards to when you test positive for drugs, the window as to what you can do from his standpoint is somewhat limited to the person, but he was given a pre-termination process. He was notified, as is required, by the parish. He was notified by a supervisor that he had failed his drug test. From there, he went to the human resource manager, Mr. Ortego. He admitted to Mr. Ortego and his supervisor that he had used marijuana. He knew that the policy was he could not use marijuana in his safety-sensitive position. He knew that. He has to take responsibility for his own actions. But the parish still afforded him. This is not the parish's first case. They afforded him his due process, and they discussed it with him. In the form that it's in, he was talking with the supervisor first, then he contacted Mr. Ortego. He knew the issues. The parish never told him he was losing his retirement. There are two issues of retirement that I think that this court needs to understand. One is his state retirement with PERS. That's the parochial employment retirement system. It has nothing to do with the parish. We can't take that away from him. We never told him we were taking that away from him. The other is a post-retirement health benefit, that if you meet the eligibility requirements of that plan, you're entitled to it. One of the eligibility requirements is you have to not be discharged for a reason. You have to be in good standing. So that is why when he called Mr. Parks called Mr. Ortego, and that's what the testimony is. You can look at the record. I'm not going to mislead the court on the testimony. The testimony is he contacted Mr. Ortego and asked him what his options were. He then contacted the parish manager who he had known for years, Mr. Al Leveron. This transpired started early in the morning on October 15th. Look at the time of his resignation. It was at 4 o'clock. Now let's talk about what transpired at 4 o'clock in the afternoon, which is a handwritten, not resignation, retirement, his retirement, where he made his choice. So who did he talk to before he made that decision? He talked to that parish manager, Al Leveron. Mr. Leveron gave him his options. He said, Terry, you failed the drug test. Your options are limited. What can they tell him? The only thing they could say was you have the right, Terry, to if you're going to stay on and you have no legitimate basis to convince us otherwise as far as a pre-termination, you could file a grievance. He knew about the grievance process. He had eight days from the time he'd been terminated to file a post-termination grievance process. But he was told that if you do not retire in good standing and if you're terminated, that will affect your ability to receive post-retirement health benefits. He was also told that he could have the results retested. That is basically when somebody in his situation gets caught, you tell them, that's what you tell them, is listen, you can go have your test, you can have your sample retested. Same sample? Yes, ma'am, the same sample. It was a non-DOTD test. So what they do is that they take the sample and they make sure the lab makes sure they keep enough, and then they have it retested. Okay, this was on? He's got a chain of custody problems. How does that solve that? Well, there was no chain of custody problems, Your Honor. What he alleged was is that he alleged that he did not initial the vial. The collector collects the urine. The collector said he handed it to him and he thought that he had initialed it, but that's not considered a fatal flaw, and that wouldn't be something that the government is responsible for as we're not responsible for that, and that is the collector that we contracted with. The district court addressed that in its first opinion and addressed it again in its second opinion. It's well stated that that is not those minor deviations, even if they are, do not arise to what is necessary for pre-termination due process. But at the time, you don't think that Mr. Parks knew he didn't initial that vial? I'll tell you why. He signed on the form. If you look at the form and go in the record, there's a certification. He certified that it was his urine. So when the sample gets to Aaliyah, Aaliyah gets thousands of drug samples. They don't know who Terry Parks is. So what they did is they have to make sure that the chain of custody form, that the vial is sealed. They go through that process. If not, they kick it out. They're not going to take the chance of themselves getting sued. So they kick it out. What Mr. Green testified to at Aaliyah was is that everything was done right and that he's 100% certain that this man had marijuana. Now let me tell you what happened with this, how this is broken. I'm deviating a little bit, but this is I want you to understand about this, allegations about that the seal was broken. Mr. Parks, when he was advised and given the form that he busted, at some point in time he started gathering information. So he wanted a copy of the seal. Well, they had to go back to the lab to get the seal. They said, well, obviously the urine had already been tested. So when they took a picture of it to send it to him, the seal had been broken because they had already tested it. That's a red herring. That vial was sealed when he got to Leo Toxicology. Then it goes to the MRO, the medical review officer, and the medical review officer's position on the drug test is very simple. What he said, Dr. Hannon is a well-respected physician in Louisiana. His clinic does thousands of these. What he says on a non-DOTD and where the policy allows, because it says that the Terrible Impairment Policy says that these are guidelines. So when they apply it, what he said was in Louisiana he can use his staff to contact the person about their urine to discuss. And here's what they're trying to find out. His staff has a form. The form's in the record. The young lady called Mr. Parks and asked him what they're trying to find out is, are you given a prescription for medical marijuana? Did you take any medicine that may have had THC? They're not asking about voluntary retirement. That's your due process is to make sure that the test and the test was done valid. The parish has no motivation in this except to help Mr. Parks. Now, it does have in the policy, and the policy states that if you pass the drug test, the repercussion for that is termination. But that doesn't mean that they didn't follow the due process rights. That's no different than a criminal statute that says if you take something of value, you can be convicted and sentenced up to five years. It doesn't put it there. You don't have to write before the criminal statute. You entitled the Fourth Amendment. You entitled the Fifth Amendment, the Fourteenth Amendment, the Eighth Amendment. The parish knows what it had to do, and it did what it had to do. Before he made his decision, he talked to his wife, who was a parish employee. He called an ex-parish attorney who had represented him in a previous grievance. He consulted an attorney. He talked with Mr. Artigo, who's a human resource manager. He talked with his supervisor, Mr. Mike Ardon. He talked with the parish manager. He talked with the MRO's office. What more, as Judge Feldman said, what more could we have done? What they did is they, because he was a long-term employee, they gave him an out, and they went to the parish president and said, Would you make an exception to let Terry retire so that would make him eligible to receive his post-retirement health benefits that's paid by the parish? That's not a state benefit. That's a parish benefit. They were nice to him. His wife was working for the parish, and what they did was to save premium, they were going on his health insurance. She did not have the requisite number of years to make eligibility. She was planning on retiring. She'd have had to work another five years. So he had to make a decision. They didn't force him to do it. This is what Terry could have done. He could have gone through his pre-termination. He got his notice. They would have terminated him. He had eight days to file for a post-grievance. It's in the policy. He could have filed for a post-grievance, but guess what? If he lost, he lost. He would have been a terminated employee. He could have taken that route. He chose to take that route. The next thing I want to address is about his retirement and where he voluntarily retired. There's a presumption that he knew what he was doing. I'm not going to go through and break down each case. It's very well briefed. There's no issue here between subjective and objective because there's no evidence that Mr. Parks presented that would lead anybody, whether it's on an objective or a subjective test, he has no evidence to show that the parish had a motivation to deny him pre-termination due process. It almost begs for so logical based on the evidence. It doesn't make any sense. The parish had no motivation. There's no evidence that the parish had some motivation against Terry Parks to do something wrong. He knew he wasn't supposed to use drugs. He's in a safety-sensitive position, which he admitted himself, and that was the parish's policy. Now, who gets the benefit of any doubt in that? It should be the parish. We're running a very large operation. We're a small municipality, and we try to play by the rules. With regards to all these little deviations and what he's talking about, the testing and the split sample and the MRO, if he had a serious problem, then why didn't he go get his urine retested? He could have had it retested. He was officed to have his urine retested. He was told that in the pre-termination hearing that Mr. Ortego and Mr. Lebron said, Look, Terry, you can go have your urine retested. The lab, the MRO, said that would have been fine. He would have notified the lab. The lab takes a sample, and you send the same sample. But his question was, Do I have to use the same urine? Okay. Well, of course, none of them want to use the same urine, and that was one of the things that I asked in the deposition. I asked every one of these people, Is this common that people try and figure out clever ways to get out of these testing? Happens every day. Happens every day. Terry Parks knew he didn't initial that vial, okay, because he's the one that brought it up. He asked them, What happens if I didn't initial the vial? Well, how could you ask that question unless you knew? They didn't. Remember, we're not the collector. We contract it out. Al Lebron, Mike Ardon, his supervisor, and the human resource manager, they didn't go with him to give the urine test. They went at MMSI. That's done at a private facility, a contracted facility. They went with him. They didn't know he didn't initial it, but that's still not considered even a fatal flaw that would have stopped the test. And even if you go under the federal guidelines, Your Honor, the federal guidelines is a no cause of action, and the jurisprudence throughout the United States has recognized that. There's a no cause of action. In fact, in the federal jurisprudence, it's very difficult to even sue for negligence. That's why what happens most of the time is they'll try a negligence claim under state law. It just so happens that, as you recognize, and it was in the brief, they had cited, Mr. Parks had cited a case, a Louisiana case, stating that there was a cause of action. And as it turned out, when I researched it, that that case had not only been overruled, but the Louisiana legislature made sure that these employers and that these private contractors could not get sued. And they went and passed law. They took the law off the books, and that was way before this case. So in a nutshell, if you look at his brief on page 40, Mr. Parks' brief, he alleges that Kevin LaConte was negligent, neglected. Kevin LaConte was the collector. I'm saying I wouldn't take all these people's deposition. I think they did everything correct. But if they're alleging somebody neglected something, why didn't they go pursue their cause of action against those people, those private contractors? We're not responsible for the private contractors. There's no allegations, and Judge Feldman eloquently in both decisions addressed that, that there were no Mon-El violations that the parish did. Not only was there no Mon-El violations the parish did or has, but that the people that are private were not proven to be related to where we had anything to do with their actions. I do not know, and I attached because Mr. Parks in his excerpts attached only part of the policy of the drug policy of the parish. It's in the record, but he did not attach the pages that talk about where it says that they adopt both federal and Louisiana as guidelines. So you've got to read the entire policy in global. You just can't pick out and say this is what this section says. I'm going to conclude by stating to this Court the following. The trial court's decision in this case is correct. There are no material facts in dispute that would support a genuine facts that would support a civil rights 1983 action. Terrebonne Parish Consolidated Government did not constructively discharge Terry Parks. Terry Parks was well-informed. He had advisors. He had all day to make a decision. Even by law, if you go by it, once you test positive, certain things have to happen. But due process on a pre-termination notice does not mean we have to keep this open for weeks. He had the opportunity that if they made the decision to terminate him, he could have gone to the next step. He made the decision and took the retirement. And obviously, he says, I would like to take advantage. Please accept this as my request for retirement effective today, 10, 15, 15, 4 p.m. I would also like to take advantage of any retirement benefits I'm entitled to. Sincerely, Terry Parks, 10, 15, 10, 15. All right. What more could we have done? All right. Thank you. Thank you. Mr. Smith, do you have some rebuttal time if you wish to use it? Yes, Your Honor. Mr. Abier keeps saying and has said through this case this is a non-DOTD test. There is no evidence of that in the record. I quoted to Your Honor the specific requirement that they follow the DOT regulations. He produced some documents today that he says in the record, but there's no record reference. I don't know how the counsel and the courts are going to dig through the whole 2,300 pages of record reference to see if this piece of paper is in there. I don't know. But anyway, he says today that what he's talking about today is it has to be either compliance with the federal regulations or compliance with the state law. The state law requires compliance with the SAMHSA regulations, which in the Richard v. Lafayette Police and Fire Board said was very, very similar to the federal regulations. And under the state law, the Supreme Court held in Richard noncompliance with those regulations was part of the finding that there was a violation of due process. The question is a great one. What more could they have done? Well, what they could have done if they had given him pre-termination notice and access to the employer's evidence, there could have been some administrative addressing of this issue about the drug testing, whether the drug testing was valid. And that was never afforded. It's key to this case. It's critical to this case. And it was never afforded. Ms. Hebert says that there was no violations of the chain of custody. But the regulations say that the urine collector has the duty to ensure that the employee initials the seals for the purpose of certifying that the bottles contain the specimens he or she provided. And then the urine collector has the non-dedicable duty to record that on the custody control form. And that is what initiates the chain of custody. That wasn't done. The testimony was uncontested. That wasn't done. They even used the wrong form. But none of that was done. Now, the next thing I wanted to bring to the Court's attention is that Mr. Hebert says where he talked to people throughout the day. Talking to people that you're working for, he was still employed, is not a substitute for the compliance with the mandatory minimum procedures set forth by the Supreme Court. Could he waive those if he wanted to? I'm sorry? Could he waive those if he wanted to? He could. Did he tell somebody that he had been using marijuana? No. No. That's a disputed issue of fact. And also, that's one of those things like in the Reeves case, the Reeves v. Sanderson Plumbing Company. The Court shouldn't credit the self-serving testimony of an employer if the person talking is a person that's interested in the outcome of the case. You look at the evidence that is most favorable to the non-movement. The same goes for Aaliyah's testimony that it was a perfect test. Aaliyah was testifying about their part of it. There's three parts of it, the collection, the Aaliyah testing, and then the MRO process. Aaliyah said it was perfect and all that. But you don't have to credit that on a motion for summary judgment. In fact, you should not. Now, I respectfully submit that there is more than ample contested issues of material fact in this case. All we're asking is to have these issues tried, and these are very important. This is a very unique case, it seems to me. You don't see the confluence of these testing issues. If you had a trial and your client lost in the trial, where would he be with respect to his health benefits and the rest? His retirement benefits have been earned. They were vested. The health benefits. The health benefits. I contend, and it's not a part of the claims in this case, but I contend that once he was approved for the drop program, his retirement benefits vested at that time, and that that includes the health insurance benefits. So you'd say if you went to trial and won, you still had other options. Is that what you're asking? Sure. Yes, sir. I appreciate the court's consideration very much. Thank you. All right. Thank you, counsel, both sides. Appreciate your briefing.